## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

JASHAR MORRIS,

      Movant,

v.                           Case No. 2:05-cr-00125
                                      Case No. 2:06-cv-00938

UNITED STATES OF AMERICA,

      Respondent.

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court is Movant's Motion to Vacate, Set Aside and Correct Sentence, filed pursuant to 28 U.S.C. § 2255, on November 3, 2006 (docket # 63), amended on November 30, 2006 (# 70). It was referred to this Magistrate Judge by Standing Order.

Movant, Jashar Morris (hereinafter referred to as "Defendant"), is serving a 120 month period of imprisonment, to be followed by a five year term of supervised release, upon his guilty pleas to possession with intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count One), and carrying a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two). The presiding district judge also imposed a special assessment of $200.00, and waived imposition of a fine. (Judgment in a Criminal Case, entered November 4, 2005, # 48.) Defendant did not take a direct appeal.

In his original § 2255 Motion, Defendant makes the following claims for relief:

A. Ground one: The conviction was obtained and sentence imposed in violation of the Sixth Amendment right to counsel and the right to effective assistance of counsel at all critical stages of the proceedings. Please refer to 2255 Memorandum of law for detailed explanation. Defense counsel failed to investigate the facts and raise a merited suppression issue (illegal search and seizure); defense counsel also told defendant that he can't withdraw his plea after being signed even though it was not yet accepted by the court; had defendant plead before a discovery was received; and told the defendant not to worry about the mandatory minimums, as he would not be sentenced to them because of term of provisions.

B. Ground two: The conviction was obtained and sentence imposed in violation of the Fifth Amendment right to due process of law and equal protection of the laws. Plea was not knowing, intelligent, and voluntary. It was improperly induced. Defense counsel failed to adequately investigate the facts and induced defendant to take plea on a false promise; told defendant not to worry about mandatory minimums, as he would not be subjected to them; thus, misrepresenting the terms of the plea; told defendant that he could not withdraw his plea after signing it, even though it was not yet accepted by the court.

(# 63, at 4-5.) Defendant submitted a memorandum in support of his Motion (# 64). Defendant's Amendment to his memorandum (# 70) provides additional detailed facts and argument, and attaches exhibits.

The undersigned directed the United States to file a response (Order entered December 4, 2006, # 71), which was filed on December 29, 2006 (# 72). The Response included a one-page affidavit by Defendant's attorney, William Forbes (# 72, Ex. 1). Defendant filed a Traverse (# 73), the United States submitted a response to

2

the Traverse (# 74), and a Supplemental Response (# 75) with another affidavit from Mr. Forbes.  Defendant filed a so-called "Rebutt" (# 76).

The undersigned determined that an evidentiary hearing was necessary, and counsel was appointed to represent Defendant.  The hearing was held on August 14, 2007.  At the hearing, Defendant and his counsel stipulated that the only issue to be considered was whether Defendant was denied effective assistance of counsel when his retained attorney, William Forbes, failed to file a motion to suppress evidence.  All other grounds for relief set forth in Defendant's *pro se* filings were withdrawn on the record.

<u>Background</u>

During the evidentiary hearing, Sgt. William Winkler of the Charleston Police Department, the arresting officer, testified consistently with his arrest report, which reads as follows:

> On 20 May 2005 at 1640 hours the undersigned was working speed enforcement in the 100 block of Virginia Street east.  Metro communications dispatched a single patrol officer (201 – Ptlm. Hunt) to a shots fired call in the 2600 block of 7th Avenue.  Metro advised they were receiving calls from citizens that a hispanic male, wearing blue jean shorts and a grey t-shirt[1], had dropped a gun from his pants.  The gun discharged and shot the hispanic male in the leg.  Metro further advised the gun was still lying in the street and the male was walking west.
>
> Cpl. S. Williams and the undersigned responded to the area along with Sgt. J. Beckett who was the west

---

[1] The dispatcher recorded the informant as saying that the subject wore a gray "shirt," without specifying a t-shirt.

district supervisor.  We arrived on the scene after about a ten minute travel time; traffic was heavy on Patrick street.   Other officers were checking the area when I observed a light skin black male walking east in the alley between 7th Avenue and W. Washington Street.  This alley was the 2600 block.  The male was wearing a grey t-shirt and blue jean shorts.  I drove toward the subject and he began to swing his arms and appeared to be saying something.  He appeared to be aggitated [sic] as if he was upset over something.   I exited my cruiser and ordered the subject on the ground.  He stopped walking and just looked at me.  I again ordered the subject on the ground while I pulled my service pistol to the low ready.  The male went to the prone position about thirty feet from my position.   The subject was identified as Jashar Morris.

I walked up to him and holstered my pistol.  I asked him if he had been shot because we received a call of a person matching his description had been shot.   He responed [sic] by saying "I haven't been shot but I've got a gun in my pocket".  He went on to say that he was "upset with his baby's momma" and that he had dropped the gun.  While he made this statement he rolled on his right side exposing the left front pocket to his jean shorts. I removed a Colt .45 caliber revolver from this pocket. The revolver was secured in my cruiser and I returned to Morris.  Ptlm. Hunt and I stood Morris to his feet and walked him to my cruiser.

I conducted a search incident to arrest and found two baggy's of suspected crack cocaine in the same pocket.  Additionally in this pocket was two hundred and tweny[sic] five dollars in U.S. Currency.  A pack of opened Newport cigarettes was in the right front pocket along with keys.

Mr. Morris was transported to PDO by Ptlm. Hunt. Cpl. T. Williams took four digital photographs of Morris to document the clothing he was wearing.[2]

Cpt. T. Palmer responded to PDO and took custody of the crack cocaine.  The revolver was turned into property and evidence with a firearms trace form.

---

[2] The photographs are not in the record.

Upon    arrival    at    the    station    the    undersigned
inspected the revolver.  The six shot revolver was loaded
to capacity.  Under the hammer was an expended round.

(# 91, Ex. 1, at 5-6.)

In response to questions by Defendant's counsel, Sgt. Winkler
stated that "at a distance, [Defendant] appears to be a Mexican
male as it was dispatched.  He's a light-skinned black male. * * *
And based upon those things and his being in the area where the
call originated from, that's the reason why I stopped him."  (Tr.
Evid. Hr'g, # 93, at 12-13.)  Sgt. Winkler ordered Defendant to the
ground "[b]ecause he matched the description of someone that I was
told had a gun."  <u>Id.</u>, at 13.  The officer did not assume that the
gun had been left on the ground because he doesn't "take things for
granted when I'm dealing with a firearm."  <u>Id.</u>  He explained that
when he drew his weapon and ordered Defendant to lie on the ground,
he did not believe that he had probable cause to arrest Morris.
<u>Id.</u>, at 16.  He stated, "I felt like I had reasonable suspicion
based  upon  his  physical  appearance,  the  clothes  that  he  was
wearing, the location that I found him in.  And based upon the fact
that he may or may not have a gun on his person and the fact that
he  was  agitated,  that's  the  reason  why  I  had  him  get  on  the
ground."  <u>Id.</u>  Sgt. Winkler testified that as he was driving to the
scene, dispatch told him that they were receiving multiple calls
from citizens.  <u>Id.</u>, at 17.  When Sgt. Winkler saw Defendant, he
"felt that he was the one that we were looking for."  <u>Id.</u>  When

5

asked if he made an investigative stop or a seizure, Sgt. Winkler replied, "I wanted to determine, investigate further to see if he had indeed, one, been shot; two, had a gun on his person, further the investigative process." Id.

On cross-examination by the government, Sgt. Winkler explained that the fact that dispatch received multiple calls about the gunfire made the report more credible. Id., at 19. He stated that the area where the gunfire occurred is a high crime, high drug area, and that the police treated the matter as serious. Id., at 20. He confirmed that if Defendant had not had a gun, and had not had drugs, he would have been released. Id., at 22.

With respect to the original call to dispatch, the government offered Government Exhibit 1, the CAD Operations Report for this incident. Id. It reflects that the caller gave his first name, "Scott," and a telephone number at an established business in the vicinity. Id., at 24. Dispatch noted the original call at 4:40 p.m. as follows:

> COMPL ADV MEXICAN MALE WAS WALKING ACROSS FROM CHARLESTON MOTOR CO. DROPPED A GUN FROM PANTS AND IT DISCHARGED. POSS SHOOTIG [sic] HIM IN LEG. MALE IS NOW WALKING TOARD [sic] THE GOMART. BLUE JEAN SHORTS AND GRAY SHIRT. MAY POSS BE GOING TO THE BAR IN THIS ARA [sic]. AS FAR AS COMPL KNOWS THE GUN IS STILL ON GROUND.

Gov't. Ex. 1. Six minutes later, at 4:46 p.m., dispatch noted, "VICTIM HAS WALKED OFF." Id. Two minutes after that, at 4:49 p.m., dispatch noted: "CALLED COML BACK ADV HE WAS LIMPING." Id. While Exhibit 1 is some evidence of Sgt. Winkler's knowledge, it is

6

not a complete transcript of the radio traffic concerning the incident.

On redirect examination, Sgt. Winkler confirmed that his first contact with Defendant was to order him to the ground, and Defendant immediately submitted to that command.  Id., at 28-29.

Defendant testified at the evidentiary hearing that he did not discuss with his attorney, Mr. Forbes, the possibility of filing a motion to suppress evidence.  Id., at 33.  He stated that if he had known that there was a reasonable probability of a meritorious suppression motion, he would not have pled guilty.  Id.  He further stated that if his motion to suppress had been denied, he would have wanted to appeal that decision, pursuant to Rule 11(a)(2), *Fed. R. Crim. P.*  Id., at 34.

William Forbes testified and conceded that he had submitted an affidavit concerning his representation of Defendant which contained some errors.  Id., at 60-62.  When asked about the lack of a motion to suppress, Mr. Forbes gave several explanations:

> - we never got far enough in the process where you would filed a motion to suppress.  Id., at 62.
> - there are always remote issues and nonviable issues and marginally viable issues in criminal cases where you could raise them . . . just to preserve the record and hope lightening strikes at some point . . ..  Id., at 62-63.
> - I had all the discovery I needed to give him good legal advice in, in regards to this case.  Id., at 63.
> - I didn't believe that there was a search and seizure issue likely to end up with him being discharged from this case as a result of a violation by the arresting officer.  Id., at 68.
> - I . . . didn't think that there was a winnable search

or seizure issue in it or one worth risking the potential
downside of not taking a plea agreement.  Id., at 69.
- [I did not research anonymous tips or 911 calls], in
this particular case.  Id.
- I didn't think that there was a search and seizure
issue worth risking an extra bunch of time in jail for.
Id.
- I discussed the case with Mr. Morris.  I don't recall
a specific conversation where I said, "We could file a
motion to suppress and I don't think you'll win that or
not," in that exact language.  Id., at 70.
- I told him if he wanted to go to trial, I'd be more
than glad to try the case.  I thought there was a
substantial risk of getting more criminal time if he
didn't take the plea agreement.  And I thought that there
was a substantial chance of him getting a substantial
assistance motion as things stood at that time if we did.
And that's the analysis I gave him.  Id.
- my recollection was that there was a substantial risk
of ending up with more charges if we played hardball with
these guys and ending up where we weren't looking at a
five-year or a ten-year base, but a longer period of
time.  Id., at 71-72.
- But it seems to me when I read the report, there was
something in there that scared me in terms of a downside
that at that point in time hadn't been charged or hadn't
been thought about.  Id., at 73.

When asked if he "would have explained to [Defendant] that there

was a possibility that he was seized before he gave this evidence

without probable cause," Mr. Forbes replied that he did not recall.

Id., at 75.  Mr. Forbes explained, "I took as quick a plea as I

could get in order to try to limit the amount of harm he would be

subject to and to keep open the option of reducing the sentence he

was going to get."  Id., at 83.

Arguments of the Parties

     Defendant contends that Mr. Forbes was constitutionally

ineffective in his representation due to his failure to file a

motion to suppress the statements and evidence seized from Defendant on May 20, 2005. (Def. Mem., # 95), at 1.) He argues that there was a reasonable probability that such a motion would have succeeded, in which case there is a reasonable probability that Defendant would not be serving a ten-year sentence; thus he was seriously prejudiced. Id. He asserts that he was "unquestionably seized when Sgt. Winkler pointed his gun at him at the low ready and ordered him to the ground." Defendant contends that the tip which led Sgt. Winkler to seize Jashar Morris provided an insufficient basis for a reasonable suspicion that criminal activity was afoot, as required by Terry v. Ohio, 392 U.S. 1 (1968). Id., at 8-13. He makes the following points in support:

    - the caller, "Scott," was an unknown informant whose
    credibility could not be assessed.
    - the tip provided no personal information about Morris.
    - the information did not match Morris.
    - there was no criminal activity afoot.

Defendant rejects Mr. Forbes' explanation of the necessity of pleading quickly, and notes Forbes' economic incentive to do as little as possible for the retainer of $10,000. Id., at 15 n.5. In support of his arguments, Defendant relies on Florida v. J.L., 529 U.S. 266 (2000), United States v. Brown, 401 F.3d 588 (4th Cir. 2005), and related cases addressing anonymous tips and 911 calls.

    The United States responds that a motion to suppress did not have a reasonable probability of success, that Defendant failed to prove that Mr. Forbes did not discuss the Fourth Amendment issue

with him, and that there were legitimate reasons to enter a plea agreement with the United States.  (Resp., # 97, at 6.)   The government asserts that <u>Florida v. J.L.</u>, and <u>Brown</u> are distinguishable because there were multiple calls to 911, the call was not anonymous, the criminal activity afoot was the discharge of a firearm in a high-crime area, and Defendant was highly agitated. <u>Id.</u>, at 8.   The United States contends that Defendant is not a credible witness, and his testimony as to whether he would have pled guilty if he had known of a potential motion to suppress, should not be believed.   <u>Id.</u>, at 9.   Finally, the government contends that Mr. Forbes' advice to enter a plea agreement early, cooperate with the United States, and hope for a substantial assistance motion, was not ineffective.

<u>Ineffective assistance of counsel</u>

The Supreme Court addressed the right to effective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in which the Court adopted a two-pronged test.   The first prong is competence; movant must show that the representation fell below an objective standard of reasonableness.   <u>Id.</u>, at 687-91.   There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the performance of counsel.   <u>Id.</u>, at 688-89.

In order to meet the first prong, movant

must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id., at 690.

The second prong is prejudice; "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694.  The court may determine the prejudice prong prior to considering the competency prong if it is easier to dispose of the claim on the ground of lack of prejudice.  Id., at 697.  In the context of a case in which a defendant pled guilty, he must show that he would not have pled guilty but for counsel's incompetence.  Hill v. Lockhart, 474 U.S. 52 (1985); Fields v. Attorney General, 956 F.2d 1290 (4th Cir. 1992).

Defendant has identified the failure to file a motion to suppress Defendant's admission that he had a gun, and to suppress the drug and gun evidence seized from him, as the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must determine whether, in light of all the circumstances, the identified acts or

11

omissions were outside the wide range of professionally competent assistance.  If so, then the court will address prejudice.

### Credibility of Witnesses

The court completely credits the testimony of Sgt. Winkler, the arresting officer, who testified consistently with his report, without embellishment.  Sgt. Winkler is an experienced patrol officer, who is clearly very familiar with the West Side of Charleston, where the incident occurred.

The court credits the testimony of Defendant to the extent that he stated that his attorney never told him that he had a potential motion to suppress, and that, with a conditional guilty plea, he could appeal the denial of a motion to suppress. Defendant, by his own conduct in writing various letters, undermined his credibility and eliminated the possibility of having a Rule 35 motion filed on his behalf; however, the court is convinced that Defendant was surprised to learn from other inmates and from research at the prison law library that a motion to suppress could have been filed.

Mr. Forbes did not testify unequivocally that he advised Defendant of the potential motion to suppress; he stated that he "did not recall" such a conversation.  It is highly unlikely that Mr. Forbes' discussed with Defendant the possibility of filing a motion to suppress, and of pleading guilty if the motion were denied and preserving the right to appeal on that issue.  Mr.

12

Forbes submitted an affidavit to the court which contains misstatements. In an affidavit signed December 21, 2006 (# 72-2), Mr. Forbes stated that he was "court-appointed" [he was retained], and that Mr. Morris pled guilty on November 4, 2005 [he pled guilty on July 21, 2005]. He further stated: "The evidence obtained against Mr. Morris was not in violation of his rights. Had there been even a remote illegal search and seizure issue, I would have raised it." The court finds this latter statement to be inconsistent with Mr. Forbes' testimony at the evidentiary hearing and not true.

### Objective Standard of Reasonableness

In 1993, the American Bar Association published its ABA Standards for Criminal Justice: Prosecution and Defense Function, 3d ed. Standard 4-3.6, Prompt Action to Protect the Accused, at pages 170-71, provides as follows:

> Many important rights of the accused can be protected and preserved only by prompt legal action. Defense counsel should inform the accused of his or her rights at the earliest opportunity and take all necessary action to vindicate such rights. Defense counsel should consider all procedural steps which in good faith may be taken, including, for example, . . . moving to suppress illegally obtained evidence, . . . and seeking dismissal of the charges.

Standard 4-5.1(a), Advising the Accused, at page 197, states that "[a]fter informing himself or herself fully on the facts and the law, defense counsel should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of

the probable outcome."

The importance of an attorney investigating the facts and the law of every case is underscored by the Rule 11 colloquy which occurs during the course of every guilty plea hearing in this District.   The presiding District Judge, the Hon. Joseph R. Goodwin, addressed Mr. Forbes as is the custom:

> THE COURT: Mr. Forbes, are you satisfied if this case went to trial there would be no meritorious legal defense?
> MR. FORBES: Yes, Your Honor.
> THE COURT: Are you satisfied that Mr. Morris's constitutional and other legal rights have been fully observed?
> MR. FORBES: Yes, Your Honor.

(Tr. Plea Hrng., # 61, at 16.)

Mr. Forbes was the prosecuting attorney for Kanawha County, West Virginia, from 1989 to 2000, during which time <u>Florida v. J.L.</u> was decided.  He held a position of public trust and should have been keenly aware of the implications of that ruling for encounters between police and citizens.  Nonetheless, his conduct will be considered in the context of "reasonable professional assistance," just like every other criminal defense attorney.

Any inquiry regarding a motion to suppress begins with the Constitution.  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.   Was the encounter between Sgt. Winkler and Defendant "reasonable?"  The Supreme Court has identified three levels of

encounters between police officers and citizens which are reasonable, depending upon the existence of an applicable level of suspicion regarding the actions of the citizen.  See United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002).  An arrest must be supported by probable cause to believe that the citizen has violated the law.  Brown v. Illinois, 422 U.S. 590 (1975).  A brief investigatory stop must be supported by reasonable articulable suspicion that criminal activity may be afoot and that the citizen may be armed and presently dangerous.  Terry v. Ohio, 392 U.S. 1 (1968).  A brief consensual encounter need not be supported by any objective justification.  Florida v. Bostick, 501 U.S. 429 (1991).

The court notes that the City of Charleston, West Virginia has enacted ordinances which prohibit carrying a pistol without a license (Sec. 78-163), and discharging a firearm within the city "except in the lawful defense or person or property and except when necessary in the performance of a lawful duty" (Sec. 78-166).  Of course it is impossible to know if a person has carried a concealed weapon without a license until there has been a determination of the issuance of the license to a particular subject.

At the moment that Sgt. Winkler encountered Defendant, he did not immediately place him under arrest, and he did not have a brief consensual encounter.  As the Supreme Court wrote in Terry, 392 U.S. at 16, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."

The Fourth Circuit has described a "seizure," as "when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." United States v. Sullivan, 138 F.3d 126, 133 (4th Cir. 1998). In United States v. Brown, 401 F.3d 588, 593 (4th Cir. 2005), the Fourth Circuit identified factors which determine whether an encounter is a seizure.

> A number of circumstances inform the inquiry of whether a reasonable person would feel free to disregard the police, including 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed.2d (1980)(opinion of Stewart, J.).

Under these decisions, there is little question that Sgt. Winkler "seized" Defendant when he unholstered his weapon, held it at the "low ready" position, and ordered Defendant to lie on the ground.

The next inquiry is whether Sgt. Winkler's seizure of Defendant was reasonable. It is helpful to return to the beginning of "stop and frisk" cases, Terry v. Ohio, which states its holding as follows:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety,

16

he is entitled for the protection of himself and others
in the area to conduct a carefully limited search of the
outer clothing of such persons in an attempt to discover
weapons which might be used to assault him.   Such a
search is a reasonable search under the Fourth Amendment,
and any weapons seized may properly be introduced in
evidence against the person from whom they were taken.

Id., at 30.

More than thirty years later, in 2000, the Supreme Court
issued its decision in Florida v. J.L., supra, which addresses the
seizure of citizens based on an anonymous tip.  In Florida v. J.L.,
the tip was received via a phone call from an unknown location by
an unknown person, alleging that a young black male standing at a
particular bus stop and wearing a plaid shirt was carrying a gun.
529 U.S. at 268.  Some time later (at least six minutes later but
otherwise unknown), the police arrived and discovered three young
black males at the bus stop, one of whom was wearing a plaid shirt.
Id.  None of the three was engaging in illegal or unusual conduct;
no firearm was visible; none was acting in a threatening or unusual
manner.  Id.  The police stopped and frisked J.L., who was wearing
the plaid shirt, and recovered a firearm.  The Supreme Court
identified the following factors which persuaded them that the tip
was insufficiently reliable to justify the stop and frisk of J.L.:
it was an anonymous call; the information did not predict the
subject's behavior; the police had no means to test the informant's
knowledge or credibility; the informant did not explain how he knew
about the gun; the informant supplied no inside information about

17

J.L.  Id., at 271-72.  The Court was not persuaded by the plaid shirt and location matches; the decision points out that the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."  Id., at 272.

> We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in *Adams [v. Williams, 407 U.S. 143 (1972)]* and *[Alabama v.] White[, 496 U.S. 325 (1990)]* does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.

Id., at 274.

In Adams v. Williams, 407 U.S. 142 (1972), the Supreme Court upheld a stop and frisk under these circumstances: a police officer sat alone in a cruiser in a high-crime area at 2:15 a.m.; a person known to him approached and advised that an individual seated in a vehicle nearby was carrying narcotics and had a gun at his waist; the officer went to the vehicle, asked the occupant to step out; the occupant rolled down the window and the officer reached in and removed a weapon from his waist.  Id., at 144-45.  The Supreme Court was persuaded by the facts that the informant was known to the officer and had provided information to him in the past, and that the informant came forward personally to give information that was immediately verifiable at the scene.  Id., at 146.  The Court provided other examples of situations where a tip would be sufficient: "when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a

credible informant warns of a specific impending crime." <u>Id.</u>, at
137.

In <u>Alabama v. White</u>, 496 U.S. 325 (1990), the other case
mentioned in <u>J.L.</u>'s holding, the Court addressed a case in which an
anonymous tip identified a woman by name who would leave a
particular apartment in a multi-family building, drive a specified
vehicle to a specific location, and would possess about an ounce of
cocaine in an attache case. <u>Id.</u>, at 327. A woman emerged from the
building, drove the specified vehicle toward and near the specified
location, where she was stopped; she had marijuana in an attache
case, and three milligrams of cocaine in her purse. <u>Id.</u> The Court
deemed it a "close case," but upheld the stop and frisk because

> the independent corroboration by the police of
> significant aspect of the informer's predictions imparted
> some degree of reliability to the other allegations of
> the caller.
>
>       We think it also important that, as in *[Illinois v.]*
> *Gates*, [462 U.S. 213, 245 (1983),] "the anonymous [tip]
> contained a range of details relating not just to easily
> obtained facts and conditions existing at the time of the
> tip, but to future actions of third parties ordinarily
> not easily predicted." * * * What was important was the
> caller's ability to predict respondent's *future behavior*,
> because it demonstrated inside information - a special
> familiarity with respondent's affairs.

<u>Id.</u>, at 332. [Emphasis in original.]

In <u>United States v. Brown</u>, 401 F.3d at 596, the Fourth Circuit
summarized the holding in <u>J.L.</u>: "An anonymous telephone tip that
alleges illegal possession of a firearm but that merely identifies
a suspect and his location does not itself provide reasonable

19

suspicion for a *Terry* stop." The anonymous telephone tip was that "a short, black male with glasses was carrying a firearm outside a the Roseman Court apartment complex." <u>Id.</u>, at 590. The Court noted that "at no point before Officer Lewis ordered Brown against the car did the officers observe any conduct by Brown that would cause them to suspect that he was carrying a firearm." <u>Id.</u> Thus the Court held that "the anonymous tip alone did not provide reasonable suspicion to justify seizing Brown." <u>Id.</u>

Based on the holdings in <u>Terry</u>, <u>J.L.</u>, <u>Adams</u>, <u>White</u>, and <u>Brown</u>, the following questions should be asked:

- <u>Terry</u>: Did the police officer observe unusual conduct which led him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous?
- <u>Adams</u>: Was the informant known to the police officer? Had the informant provided information to the police officer in the past? Did the informant come forward personally? Was the information immediately verifiable at the scene? Did the victim of a street crime seek immediate police aid and give a description of his assailant? Did a credible informant warn of a specific impending crime?
- <u>White</u>: Was the informant anonymous? If so, what indicia of reliability (quantity and quality of the information) exist? Was there independent corroboration by the police of significant aspects of the informer's predictions (the subject's future behavior)?
- <u>J.L.</u>: Was it an anonymous call? Did the anonymous call have indicia of reliability of the kind contemplated in *Adams* and *White*? Was there a prediction of future behavior? Did the police have means to test the informant's knowledge or credibility? Was the tip reliable in its assertion of illegality, not just identification of a subject?
- <u>Brown</u>: Did the anonymous call allege illegal possession of a firearm and merely identify a suspect and his location?

20

When the facts developed by the parties are used to answer these questions, it becomes apparent that a motion to suppress should have been filed, and there is a reasonable probability that it would have been granted. Sgt. Winkler did not observe "unusual conduct which led him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he was dealing may be armed and presently dangerous." The only "unusual conduct" which he observed was that Defendant was "agitated;" apparently he was gesturing as a result of anger or frustration arising out of his relationship with his child's mother. Defendant was doing nothing overtly criminal when he was stopped and no weapon was visible. Sgt. Winkler testified that his purposes in looking for the subject of the tip in this case were first, to determine if the person had been shot, and second, to investigate if the person was carrying a firearm. (Tr. Evid. Hr'g, # 93, at 12-13.)

There is no reason to believe that the informant was known to Sgt. Winkler or to police in general, or that he had previously provided information to the police in the past. The informant did identify himself (first name only), although he did not come forward personally. His information was not immediately verifiable at the scene, because the subject walked away from the scene. There was not an accurate prediction of the subject's future behavior (Government Ex. 1 indicates that the informant suggested

that the subject might be going to a nearby bar).  While the caller
was not completely anonymous, the information lacked the indicia of
reliability contemplated in <u>Adams</u> and <u>White</u>.  The police had no
means of testing the informant's knowledge; the tip was arguably
reliable in the identification of the subject's clothing (blue jean
shorts and gray shirt)[3], but not reliable in its assertion of
illegality.  The undersigned has concluded that the tip was not
reliable in its identification of the subject's appearance and its
assertion of illegality because of the following inconsistencies:

    - "Mexican" [Defendant is a light-skinned African-
    American]
    - shot in leg and limping [Defendant was not limping or
    bleeding and denied being shot]
    - gun still on ground [not corroborated by police].

Sgt. Winkler himself testified that his <u>Terry</u> stop of
Defendant was based on the clothing match, the location, and the
allegation that a gun was involved.  (Tr. Evid. Hr'g, # 93, at 16.)
These are precisely the three factors which the Supreme Court, in
<u>Florida v. J.L.</u>, a unanimous decision, concluded were insufficient
to justify a stop and frisk.  And these are precisely the three
factors which the Fourth Circuit, in <u>Brown</u>, similarly concluded did
not provide reasonable suspicion to justify a seizure.  Thus there
is a reasonable probability that a properly filed and argued motion

---

[3] The court has viewed a DVD of the questioning of Defendant at the
police station on May 20, 2005.  Defendant is wearing a black hooded
sweatshirt with an unzipped front zipper.  The record has no explanation of
where or when Defendant acquired the sweatshirt.  A large gray t-shirt is
observable under the sweatshirt.

to suppress would have been granted, and Defendant's statement to Sgt. Winkler and the gun and drugs would have been suppressed.

The court has considered the case of United States v. Sims, 296 F.3d 284 (4th Cir. 2002), which was decided before Brown, and which affirmed the denial of a motion to suppress.  In Sims, the Court distinguished the facts from J.L., because the defendant engaged in furtive behavior (crouched position, peeking around the corner, looking at a police officer).  When the officer made eye contact with the defendant, the defendant jerked back, out of view. The Court concluded that Sims "was not merely 'go[ing] about his business,' and an officer could quite reasonably conclude that he was hiding."  296 F.3d at 287.  By contrast, when Sgt. Winkler saw Jashar Morris, Morris was walking down the street, gesturing, but definitely not hiding or attempting evasion.   When the officer spoke to him, Morris looked at him, and then obeyed the command. Accordingly, Sims is distinguishable from this case.

Similarly, the court has considered the cases cited in the government's memorandum (# 97, at 7-9), and has determined that they, too, are distinguishable from the facts in this case.  United States v. Elston, 479 F.3d 314 (4th Cir. 2007), concerned a tip from a person who identified herself to the 911 dispatch officer, and provided inside information that Elston had left her home in a drunken state, was "driving crazy," and had recently been released from jail for a violent offense.  She provided his name, clothing

23

description, vehicle description (including the tag number), and type of weapon which he threatened to use.  The Fourth Circuit recited factors that can indicate the reliability of anonymous information, and noted the "wealth of detail" of ongoing criminal conduct which was provided to police.  479 F.3d at 318.  By contrast, the tip in Defendant's case was both "bare-boned" and wrong on significant details.

In United States v. Perkins, 363 F.3d 317, 322 (4th Cir. 2004), the police had an informant's contemporaneous viewing of the suspicious activity (two males pointing rifles in a residential but high crime, high drug use neighborhood), an assumption that the caller was a regular and reliable informant, confirmation of important aspects of the tip, and recognition of the subject as a known drug user.  Moreover, when an officer approached the vehicle in question, he observed a high-powered rifle (the subject of the tip) in plain view.  Id., at 322-23.  Even though Perkins had confirmation of many more facts than the case at bar (and no inaccurate ones), it still drew a sharp dissent that there was not "reasonable suspicion that criminal activity was afoot."  Id., at 328.  The factors which convinced the majority in Perkins that the case was distinguishable from J.L. and Brown are simply not present here (prior experience with the assumed informant, confirmation of the information, and recognition of the subject).

In United States v. Quarles, 330 F.3d 650 (4th Cir. 2003), an

24

informant stayed on the telephone with 911 dispatch for a period of fourteen minutes, watching the subject of the tip continuously, updating the police with information, and ultimately giving his own name.  Moreover, the caller alleged the subject to be a convicted felon carrying a firearm in a bag, and a fugitive from an outstanding federal arrest warrant.  Rather than immediately seize the subject, as was done to Defendant, the police had a brief, consensual encounter (which needs no objective justification), obtained the subject's name, and ran a check to determine if there was indeed an open warrant.  There was such a warrant, and Quarles was arrested.  The Fourth Circuit in Quarles held that the tip was not anonymous, and that the caller provided enough information to test his knowledge or credibility.  330 F.3d at 655.

Quarles also raises the distinction between a Terry stop for investigation of suspected ongoing criminal activity, and a Hensley stop to investigate an already completed crime.  United States v. Hensley, 469 U.S. 221 (1985).  Hensley held that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion."  469 U.S. at 680. [Emphasis added.] The court notes that neither discharging a firearm in the city nor carrying a concealed weapon without a license is a felony.  Thus Defendant could not have been searched and seized pursuant to

25

Hensley.    The Court ultimately determined that the case was controlled by Hensley, and not J.L.  330 F.3d at 656.  Thus Quarles is distinguishable from this case on many points.

In United States v. Christmas, 222 F.3d 141 (4th Cir. 2000), decided just a few months after J.L., the Court ruled that J.L. was not controlling because the officer had a face-to-face encounter with the informant, who was informing on her neighbor.  The Court reasoned that the informant's credibility was greatly enhanced because she would have had the opportunity to observe the drug-dealing activity she alleged, she was accountable to police if she gave a false report, and she exposed herself to the risk of reprisals by her neighbors.  None of the factors which influenced the Court in Christmas are present in this case.

In United States v. Elmore, 482 F.3d 172 (2d Cir. 2007), the Second Circuit considered facts significantly different from those in J.L.  In Elmore, the informant ultimately gave her full name and phone numbers to the police, and had lived with Elmore for a period of years until three days before she tipped the police to his possession of multiple firearms.  She identified his vehicle, and the various locations where Elmore kept his weapons.  There is simply no similarity between Elmore and this case.

To reiterate, the informant in Defendant's case gave some identifying information, a location, and an allegation of a firearm.  Pursuant to J.L. and Brown, Defendant had a meritorious

26

legal defense concerning a probable violation of his Fourth Amendment right to be free of an unreasonable search and seizure, and it was not raised by his attorney.

## Prejudice

A finding of prejudice is made if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

If a motion to suppress had been filed and granted, Defendant's statement and the firearm and drug evidence would have been suppressed, and it is inconceivable that the government's prosecution could have gone forward. Of course the United States could have appealed such a decision, but it is unlikely that the Solicitor General would have approved an appeal of a ruling that was consistent with <u>Florida v. J.L.</u> and <u>Brown</u>. Thus the result of the proceeding would have been different.

If the motion to suppress had been filed and denied, Defendant would have had several options:

> (a) Defendant and his attorney could have negotiated a conditional plea pursuant to Rule 11(a)(2), *Fed. R. Crim. P.* (if the government and the court consented), and preserved his appeal of the suppression issue. If his appeal were successful, he could have withdrawn his guilty plea.
> (b) Defendant and his attorney could have attempted to negotiate a more favorable plea agreement, with the understanding that Defendant would forego an appeal of the suppression issue.

27

(c) Defendant could have gone to trial and preserved his appeal of the suppression issue.

Each of these options would have improved Defendant's bargaining position with the government, possibly leading to a result more favorable to Defendant.

The United States and Mr. Forbes referred to various other charges which were the basis for Mr. Forbes' concern that his client should not delay in signing a plea agreement.  The court notes that Mr. Forbes testified that he feared that a delay in accepting the government's offer of guilty pleas to two felonies with consecutive sentences would have resulted in an increase in his client's exposure.  The United States did not refute this claim.

The parties submitted arguments concerning police reports of Defendant's other contacts with law enforcement which were the basis for Mr. Forbes' concern.  (# 98.)  The reports are as follows:

1.  January 3, 2004: Defendant was driving a vehicle (1985 Chevy Caprice) with expired registration.  A passenger was in the car.  When an officer attempted to pull him over, he fled for several blocks.  A witness observed an object thrown out of the driver's window.  Several blocks later, Defendant jumped from the vehicle while it was still rolling and, after a foot chase, was arrested.  The object probably thrown from the vehicle was a stolen .38 revolver.  (# 98-5.)  The government characterizes this as

28

potential charges of violating 18 U.S.C. § 922(j) and 922(g)(3).
(# 97, at 5.)

2.   February 12, 2004: Defendant was a passenger in a vehicle
(Toyota Tacoma) with expired registration.  The owner/driver of the
car gave police consent to search.  Upon request, Defendant stepped
out of the vehicle and a patdown produced a small bag of marijuana
from his pants leg.   He was cited for the marijuana.   Police
recovered a loaded 9mm handgun from the rear passenger seat,
another bag of marijuana from the passenger side of the truck's
cabin, and a film canister with several chunks of crack cocaine
from the driver's purse.  The driver admitted that the second bag
of marijuana was hers; she denied possessing the film canister, but
she was given a citation for it and the marijuana.  Defendant was
told that he might have another charge based on the 9mm.  (# 98-4.)
The United States suggests that this incident could be the basis of
drug charges as well as a second round of 18 U.S.C. § 924(c) and
922(g)(3) charges.  (# 97, at 5.)

3.   August 29, 2004: Police were looking for Defendant in
connection with a recent shooting involving a black male "with
Hispanic features."   Defendant was stopped and refused to give
consent to a search of the vehicle.  A K-9 alerted on the driver's
side of the vehicle; 7.5 grams of crack cocaine and 13.25 grams of
powder cocaine were recovered from the trunk.  There was a strong
odor of marijuana.   Defendant was charged with possession of

cocaine and crack cocaine.  (# 98-3.)

4.  April 11, 2005: Defendant was driving a 1983 Ford Tempo with defective equipment (loud muffler) with a passenger.  When a stop was attempted, he continued to drive several blocks and then stopped.  Prior to the stop, the front seat passenger threw an object out the window; the object was probably a baggie of powder cocaine which was later recovered.  (# 98-2.)

5.  May 5, 2005: Defendant was operating a Chevy Tahoe with three passengers.  Two bicycle unit officers attempted to stop him and he fled.  A chase continued for several blocks until several cruisers blocked his path.  The bicycle unit officers retraced the route of Defendant's vehicle and recovered two baggies with powder cocaine and crack cocaine.  Defendant was not charged with the drugs, but he was charged with fleeing in a vehicle.  (# 98-6.)

Defendant notes that all five reports were summarized and considered in his presentence report ("PSR," ¶¶ 7-12).  (# 101, at 2.)  He contends that the January and February gun incidents, if charged, would have been grouped under the Sentencing Guidelines, USSG § 3D1.2(d), and would not have increased his sentence.  Id. The drug amount in the August arrest was included in the relevant conduct computation, raising his offense level by two.  (PSR, ¶¶ 10, 18.)  At sentencing, Judge Goodwin sustained Defendant's objection to its inclusion in relevant conduct.  (Tr. Disp. Hrng., # 62, at 8-11.)  The incidents have obvious evidentiary weaknesses

in linking Defendant to the controlled substances and firearms. Defendant argues that the police reports were no excuse for failing to file a motion to suppress, and the undersigned agrees.

### Proposed Findings

The undersigned proposes that the presiding District Judge find as follows:

Sgt. Winkler stopped, frisked, and seized Defendant on May 20, 2005, on the basis of a semi-anonymous tip (first name known, last name unknown, reachable by telephone, but no prior experience in providing police with reliable information) which lacked indicia of reliability of the kind contemplated in Adams and White. The tip alleged possible possession of a firearm, and merely identified the suspect and his location. Defendant was not acting furtively or evasively when Sgt. Winkler saw him. Defendant was not doing anything which would cause Sgt. Winkler to believe that he was carrying a firearm. Some of the information in the tip was wrong. The stop and frisk was not justified by the information received and constituted a violation of Defendant's Fourth Amendment right to be free of unreasonable searches and seizures.

Even though the docket sheet reflects that Defendant signed a plea agreement on the same day that Mr. Forbes filed a notice of appearance for Defendant, June 20, 2005, Mr. Forbes had already been representing Defendant for a period of time, the length of which is unknown.

Even though the plea agreement was signed by Defendant weeks before the government was obligated to disclose its evidence to defense counsel, the Assistant United States Attorney provided Mr. Forbes with copies of discovery materials prior to execution of the plea agreement.

Mr. Forbes did not file a motion to suppress.  Mr. Forbes' failure to file a motion to suppress was a violation of Standard 4-3.6, Prompt Action to Protect the Accused, and constituted a failure to raise a meritorious legal defense in his client's behalf.  In addition, assuming that a motion to suppress would have been granted, Defendant's constitutional rights were not observed throughout the proceeding.

Mr. Forbes did not discuss with Defendant the possibility of filing a motion to suppress, or negotiating a conditional plea agreement pursuant to Rule 11(a)(2), *Fed. R. Crim. P.*  Mr. Forbes' failure to discuss with Defendant the possibility of filing a motion to suppress, or negotiating a conditional plea agreement pursuant to Rule 11(a)(2), *Fed. R. Crim. P.*, was a violation of Standard 4-5.1(a), Advising the Accused.

Mr. Forbes' failures to file a motion to suppress and to discuss a motion to suppress with his client fell below an objective standard of reasonableness and were not the result of reasonable professional judgment.  These omissions were outside the wide range of professionally competent assistance.

32

There is a reasonable probability that, but for Mr. Forbes' unprofessional errors, the result of the proceeding would have been different.  Based on the leading cases on the subject matter, there is a strong likelihood that a properly filed motion to suppress would have been granted, and the United States would have dismissed the prosecution of Defendant.  Thus the result of the proceeding would have been radically different.  But for Mr. Forbes' incompetence in not discussing the motion to suppress with his client, and not filing such a meritorious motion, Defendant would not have pled guilty to two felonies and exposed himself to consecutive sentences.  Based on these findings, the court's confidence in the outcome of this case is substantially undermined.

### Recommendation

For the foregoing reasons, it is respectfully **RECOMMENDED** that the District Court grant Movant's Motion filed pursuant to 28 U.S.C. § 2255, and vacate his convictions.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(e) of the Federal Rules of Criminal Procedure, the parties shall have ten days (filing of objections) and then three

days (mailing/service), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Movant, Jashar Morris, and to transmit it to counsel of record.


  December 5, 2007                                  
        Date                          Mary E. Stanley
                                   United States Magistrate Judge